Mark S. Mester (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Email:  mark.mester@lw.com

Randy T. Austin (Utah Bar No. 6171)
Wade L. Woodard (Utah Bar No. 18155)
Justin W. Starr (Utah Bar No. 10708)
KIRTON MCCONKIE PC
36 South State Street, Suite 1900
Salt Lake City, Utah 84111
Telephone: (801) 328-3600
Email: raustin@kmclaw.com
         wwoodard@kmclaw.com
         jstarr@kmclaw.com

Jason R. Burt (Utah Bar No. 11200)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone:  (202) 637-2200
Email:  jason.burt@lw.com

David J. Jordan (Utah Bar No. 1751)
Wesley F. Harward (Utah Bar No. 15623)
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, Utah 84111
Telephone: (801) 401-8900
Email: djordan@foley.com
         wharward@foley.com

*Counsel for Defendant Ensign Peak Advisors, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE: THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS TITHING LITIGATION<br><br>*This document relates to all actions.* | **MOTION TO DISMISS OF ENSIGN PEAK ADVISORS, INC. AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:24-md-03102-RJS-DAO<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

**Page**

RELIEF REQUESTED................................................................................................1

INTRODUCTION ......................................................................................................1

PLAINTIFFS' ALLEGATIONS .................................................................................3

LEGAL STANDARD .................................................................................................4

ARGUMENT .............................................................................................................5

I.     PLAINTIFFS FAIL TO PLEAD A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST ENSIGN PEAK ................................................................5

II.    PLAINTIFFS FAIL TO PLEAD A CLAIM FOR FRAUDULENT INDUCEMENT AGAINST ENSIGN PEAK ..................................................6

    A.    Plaintiffs Identify No Representation Made To Them By Ensign Peak.................7

    B.    The Statements In Ensign Peak's Articles Of Incorporation Are True .................8

    C.    Plaintiffs Make No Allegations Of Reliance On Any Representation By Ensign Peak.................................................................................................10

III.   PLAINTIFFS FAIL TO PLEAD A CLAIM FOR FRAUDULENT CONCEALMENT AGAINST ENSIGN PEAK.................................................11

    A.    Ensign Peak Did Not Have A Duty Of Disclosure .................................11

    B.    Plaintiffs Fail To Plead Materiality, And The Church Autonomy Doctrine Otherwise Prohibits The Court From Determining What Is Material To A "Reasonable" Church Member In Deciding To Give Tithes.................................................................................................12

IV.   PLAINTIFFS DO NOT STATE A CLAIM AGAINST ENSIGN PEAK FOR FRAUDULENT MISREPRESENTATION .................................................14

V.    PLAINTIFFS DO NOT STATE A CLAIM AGAINST ENSIGN PEAK FOR UNJUST ENRICHMENT .........................................................................14

VI.   PLAINTIFFS' ALLEGATIONS REGARDING ENSIGN PEAK'S SEC DISCLOSURES AND IRS FILINGS ARE UNRELATED TO PLAINTIFFS' CLAIMS .....................................................................................................15

VII.  PLAINTIFFS' CLAIMS ARE ALSO BARRED BY THE STATUTE OF LIMITATIONS...........................................................................................17

CONCLUSION........................................................................................................21

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

<u>Armed Forces Ins. Exch. v. Harrison</u>,
    70 P.3d 35 (Utah 2003) ................................................................................................ 7

<u>Baldwin v. Burton</u>,
    850 P.2d 1188 (Utah 1993) ........................................................................................ 18

<u>Bell Atlantic v. Twombly</u>,
    550 U.S. 544 (2007) .................................................................................................... 4

<u>Brereton v. Bountiful City</u>,
    434 F.3d 1213 (10th Cir. 2006) ................................................................................ 21

<u>Bryce v. Episcopal Church</u>,
    289 F.3d 648 (10th Cir. 2002) .................................................................................. 21

<u>Colorado Christian University v. Weaver</u>,
    534 F.3d 1245 (10th Cir. 2008) ................................................................................ 12

<u>Colosimo v. Roman Catholic Bishop</u>,
    156 P.3d 806 (Utah 2007) .......................................................................................... 18

<u>Conder v. A.L. Williams</u>,
    739 P.2d 634 (Utah App. 1987) ................................................................................ 10

<u>Donner v. Nicklaus</u>,
    197 F. Supp. 3d 1314 (D. Utah 2016) ...................................................................... 18

<u>Fratello v. Archdiocese of N.Y.</u>,
    863 F.3d 190 (2d Cir. 2017) ...................................................................................... 12

<u>Gaddy v. Corp. of the President of the Church of Jesus Christ
of Latter-day Saints</u>, 451 F. Supp. 3d 1227 (D. Utah 2020) .............................. 11, 13

<u>Gaddy v. Corp. of the President of the Church of Jesus Christ
of Latter-day Saints</u>, 665 F. Supp. 3d 1263 (D. Utah 2023) ................... 5, 6, 11, 12, 21

<u>Ganino v. Citizens Utils.</u>,
    228 F.3d 154 (2d Cir. 2000) ...................................................................................... 13

<u>Gee v. Pacheco</u>,
    627 F.3d 1178 (10th Cir. 2010) ................................................................................ 21

<u>Gilbert Dev. v. Wardley</u>,
    246 P.3d 131 (Utah App. 2010) ................................................................................ 12

**Page(s)**

Hawthorne v. Couch,
   911 So.2d 907 (La. App. 2005) ............................................................................... 13

Hill v. Allred,
   28 P.3d 1271 (Utah 2001) ...................................................................................... 17

HKS Architects v. MSM Enters.,
   496 P.3d 228 (Utah App. 2021) ............................................................................ 19

Hosanna-Tabor Evangelical Lutheran Church v. EEOC,
   565 U.S. 171 (2012) ................................................................................................ 3

Huntsman v. Corp. of the President of the Church of Jesus Christ
   of Latter-day Saints, 2021 WL 4296208 (C.D. Cal. 2021) ..................................... 14

IHC Health Plans v. Comm'r,
   325 F.3d 1188 (10th Cir. 2003) .............................................................................. 8

Jackson v. Educ. & Emp't Ministry,
   686 Fed. Appx. 577 (10th Cir. 2017) ..................................................................... 5

Lawrence Nat'l Bank v. Edmonds,
   924 F.2d 176 (10th Cir. 1991) ............................................................................. 4, 7

Mitchell v. Christensen,
   31 P.3d 572 (Utah 2001) ...................................................................................... 12

Mower v. Simpson,
   278 P.3d 1076 (Utah App. 2012) ............................................................................ 5

Orlando Millenia v. United Title Servs.,
   355 P.3d 965 (Utah 2015) ....................................................................................... 5

Our Lady of Guadalupe Sch. v. Morrissey-Berru,
   591 U.S. 732 (2020) ................................................................................................ 3

Rabo Agrifinance v. Bliss,
   227 F. Supp. 3d 1249 (D. Utah 2017) ............................................................... 17, 20

Robbins v. Oklahoma,
   519 F.3d 1242 (10th Cir. 2008) .............................................................................. 4

Russell Packard Dev. v. Carson,
   108 P.3d 741 (Utah 2005) ..................................................................................... 17

Security Sys. v. Alder Holdings,
   421 F. Supp. 3d 1186 (D. Utah 2019) ............................................................... 17, 20

**Page(s)**

Shiozawa v. Duke,
  344 P.3d 1174 (Utah App. 2015) .................................................................... 18

Siebach v. Brigham Young Univ.,
  361 P.3d 130 (Utah App. 2015) .................................................................. 6, 7

Squire v. Students Book,
  191 F.2d 1018 (9th Cir. 1951) ...................................................................... 8

Stone v. Salt Lake City,
  356 P.2d 631 (Utah 1960) ............................................................................ 2

Tucker v. State Farm,
  53 P.3d 947 (Utah 2002) ............................................................................ 19

U.S. v. Ballard,
  322 U.S. 78 (2012) ..................................................................................... 14

Yazd v. Woodside Homes,
  143 P.3d 283 (Utah 2006) .......................................................................... 11

Youngblood v. Auto-Owners Ins.,
  158 P.3d 1088 (Utah 2007) ........................................................................ 12

## STATUTES

26 U.S.C. § 6033 ............................................................................................ 15

Utah Code § 13-22-1 et seq. ........................................................................... 5

Utah Code § 13-22-2 ........................................................................................ 6

Utah Code § 13-22-23 ...................................................................................... 6

Utah Code § 13-22-5 ........................................................................................ 5

Utah Code § 13-22-8 ........................................................................................ 5

Utah Code § 78B-2-305 ............................................................................ 17, 20

## OTHER AUTHORITIES

About HMC,
  https://www.hmc.harvard.edu/about/ ............................................................ 9

Doctrine and Covenants § 119,
  https://www.churchofjesuschrist.org/study/scriptures/dc-testament/dc/119?lang=eng ........... 13

**Page(s)**

Gordon B. Hinckley, Of Missions, Temples, and Stewardship (Oct. 1995),
  https://www.churchofjesuschrist.org/study/general-conference/1995/10/of-missions-temples-and-stewardship?lang=eng ................................................................. 1

Gordon B. Hinckley, The State of the Church (Apr. 1991),
  https://www.churchofjesuschrist.org/study/general-conference/1991/04/the-state-of-the-church?lang=eng ................................................................................ 1

Harvard University Financial Report (FY 2023),
  https://finance.harvard.edu/files/fad/files/fy23_harvard_financial_report.pdf........................... 9

IRS Form 990-T Instructions,
  https://www.irs.gov/instructions/i990t .................................................................................. 15

IRS Form 990-T,
  https://www.irs.gov/pub/irs-pdf/f990t.pdf........................................................................... 15

Malachi 3:10,
  https://www.biblegateway.com/passage/?search=Malachi%203%3A10&version=KJV ......... 14

## RULES

Fed. R. Civ. P. 12 .............................................................................................. 1, 16, 17, 19

Fed. R. Civ. P. 9 ......................................................................................................... 1, 4, 7

## REGULATIONS

13 C.F.R. § 240.13f-1 ...................................................................................................... 16

Revenue Ruling 58-194, 1958-1 C.B. 240.......................................................................... 8

Revenue Ruling 69-528, 1969-2 CB 127........................................................................... 9

Revenue Ruling 72-369, 1972-2 C.B. 245.......................................................................... 9

Revenue Ruling 78-41, 1978-1 C.B. 148......................................................................... 9, 10

Revenue Ruling 78-88, 1978-1 C.B. 163............................................................................ 8

Treas. Reg. § 1.502-1 .................................................................................................... 8, 9

## RELIEF REQUESTED

Ensign Peak Advisors, Inc. ("Ensign Peak") moves under Fed. R. Civ. P. 9(b) and 12(b)(6) to dismiss the claims alleged against it in the Consolidated Class Action Complaint (MDL Dkt. 63) ("Consolidated Complaint" or "Consol. Compl.") filed by Plaintiffs Daniel Chappell, et al. ("Plaintiffs"). This motion piggybacks on the motion to dismiss being simultaneously filed by The Church of Jesus Christ of Latter-day Saints (the "Church") and should be reviewed second.

## INTRODUCTION

This is no ordinary fraud case. In the first place, it lacks the most essential ingredient of a fraud claim—a misrepresentation. In fact, as to Ensign Peak, it is missing any representation. Plaintiffs allege that the Church (not Ensign Peak) "repeatedly declared" that "tithing funds are 'always used' for purposes like building construction, missionary work, education of Church members, and care for the poor and needy." Consol. Compl. ¶ 54. Plaintiffs further allege that they thought this meant all tithing funds are "immediately" used for such purposes (id. ¶ 155), and on that basis, they claim the Church defrauded them by not using all their donations immediately for religion and charity and, instead, setting aside some portion into a reserve fund.[1] Plaintiffs say they "did not believe and had no reason to ever suspect that [the Church] would take any portion of their donations and invest it into Ensign…."[2] Id. ¶ 132. Missing from Plaintiffs' allegations is

---

[1] Unless otherwise stated, all emphasis is supplied, and all internal citations and quotations are omitted from all material quoted herein.

[2] Plaintiffs' alleged surprise that the Church would save and invest "any portion" of tithing is itself surprising. The Church has informed its members that it sets aside a portion of tithing funds into a reserve fund. For example, Gordon B. Hinckley, then a senior Church leader, explained at the Church's April 1991 General Conference that "[t]he financial program of the Church" "is found in … the Doctrine and Covenants," and Section 119 of that scripture states that all members of the Church "shall pay" tithing. He added that one "fixed principle[]" of the Church's "financial operations" is that "a fixed percentage of the income" (i.e., of annual tithing funds) "will be set aside to build reserves against what might be called a possible 'rainy day.'" Gordon B. Hinckley, The State of the Church (Apr. 1991). He repeated the same thing in 1995. Gordon B. Hinckley, Of Missions, Temples, and Stewardship (Oct. 1995).

any false statement or misrepresentation from the Church—and <u>any</u> statement at <u>all</u> from Ensign Peak—that Plaintiffs supposedly relied on in giving tithes.

Ensign Peak is a "special non-profit entity" formed "to hold and invest" the Church's reserve funds.  Consol. Compl. ¶ 10.  All funds in its possession are "irrevocably dedicated to religious, educational and charitable purposes …." <u>Id.</u> ¶ 81.  Investing a portion of donated funds to allow them to grow to support the Church's religious mission into the future is prudent money management, not fraud.  Investing does not <u>divert</u> donated funds from that mission, it <u>increases</u> them and thus furthers that mission.  The Utah Supreme Court long ago rejected a nearly identical claim by pointing out that it is "common sense" and "common knowledge" that "all of the funds the Church collects would <u>not</u> be disbursed <u>immediately</u> and directly," but that some might be put to use in "savings accounts, bonds, real estate or any type of investment" to create additional income for future use by the Church.  <u>Stone v. Salt Lake City</u>, 356 P.2d 631, 633-34 (Utah 1960).

One does not have to read between the lines of Plaintiffs' Consolidated Complaint to see that their objection is not to Ensign Peak's role.  Instead, Plaintiffs' objection is that the Church's reserve fund is just too big and is not being used fast enough to suit their preferences.  Plaintiffs assert that when the IRS Letter was published in December 2019, they learned that the Church had concealed "the extent of its holdings."  Consol. Compl. ¶¶ 3, 11, 171.  They claim they had been unaware of "the scale of funds accumulated" by the Church and were shocked to learn the Church had "tens of billions" in reserves.  <u>Id.</u> ¶¶ 1-2.  Plaintiffs object to this "large-scale hoarding."  <u>Id.</u> ¶ 91.

Adjudicating whether the Church is "hoarding" or whether it is prudently saving and investing consistent with its doctrine and religious mission would require a court or jury to determine how much the Church should spend immediately and how much it should save for the future and, thus, to second-guess the leadership of the Church's prophets and apostles.  But the

First Amendment gives churches autonomy to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Hosanna-Tabor v. EEOC, 565 U.S. 171, 186 (2012). "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 746 (2020).

The unconstitutionality of Plaintiffs' claims is addressed thoroughly in the Church's motion, and Ensign Peak incorporates those arguments fully by reference here. Yet even without their First Amendment problems, Plaintiffs' claims still fail, because Plaintiffs have no relationship with Ensign Peak. Plaintiffs did not donate any funds to Ensign Peak, and Ensign Peak made no representations to them. Plaintiffs have no conceivable claim against Ensign Peak.

Moreover, Plaintiffs' claims against Ensign Peak (and the Church) are untimely on their face. The allegations on which they rely were revealed in December 2019. See Consol. Compl. ¶ 11. The applicable statute of limitations is three years, and none of the Plaintiffs sued within three years of December 2019. For all of these reasons, the Court should dismiss Plaintiffs' Consolidated Complaint against Ensign Peak with prejudice.

## PLAINTIFFS' ALLEGATIONS

Ensign Peak is a Utah nonprofit corporation formed in 1997 to hold and invest reserve funds for the Church. Consol. Compl. ¶¶ 1, 10, 42, 81. Before Ensign Peak, an internal Church department managed the Church's reserves. Ensign Peak's articles of incorporation state that it "is organized and shall be operated exclusively for religious, educational and charitable purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code, to benefit, perform the functions of, or carry out the purposes of" the Church, and all property held by Ensign Peak "is irrevocably dedicated to religious, educational and charitable purposes...." Id. ¶ 81.

Plaintiffs contend that Ensign Peak "has never fulfilled its purported purpose for [the Church] nor functioned as a charitable entity."  Consol. Compl. ¶ 82.  The "one thing" it does, Plaintiffs allege (incorrectly), is invest "without ever disbursing these funds toward any charitable purpose."  Id.  Plaintiffs accuse the Church of "taking advantage of Ensign's non-profit status to receive billions of dollars in tax breaks on the interest its investments generate, even though Ensign does nothing demonstrably charitable, religious, or educational."  Id. ¶ 85.  Plaintiffs further allege that by December 2019, Ensign Peak "had accumulated more than $120 billion from donations to [the Church] or returns on investments of those donations."  Id. ¶ 105.

Plaintiffs attempt to plead the same five causes of action against both the Church and Ensign Peak: (1) breach of fiduciary duty; (2) fraudulent inducement; (3) fraudulent concealment; (4) fraudulent misrepresentation; and (5) unjust enrichment.  All five fail.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must contain enough allegations of fact, taken as true, "to state a claim to relief that is plausible on its face."  Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007).  Mere "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are not enough.  Id. at 555.  A plaintiff must "frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief."  Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).  Rule 9(b) further requires a plaintiff to state "with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To do so, Plaintiffs must set forth the "time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof."  Lawrence Nat'l Bank v. Edmonds, 924 F.2d 176, 180 (10th Cir. 1991).

## ARGUMENT

I.   **PLAINTIFFS FAIL TO PLEAD A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST ENSIGN PEAK**

Plaintiffs first allege that Ensign Peak breached a common law fiduciary duty it allegedly owed them.  <u>See</u> Consol. Compl. ¶¶ 146-56.  Fiduciary duties are associated only with certain unique relationships where one person "is required to act for the benefit of the other on all matters within the scope of their relationship."  <u>Orlando Millenia v. United Title Servs.</u>, 355 P.3d 965, 971 (Utah 2015).  Utah law recognizes fiduciary duties between, for example, attorney and client, physician and patient, trustee and beneficiary and insurer and insured.  <u>See id.</u>

Plaintiffs had <u>no</u> <u>relationship</u> with Ensign Peak whatsoever, much less a fiduciary one.  Even so, Plaintiffs assert the Church owed them a fiduciary duty and Ensign Peak "aided and abetted" the Church in breaching that duty.  Consol. Compl. ¶ 152.  Although Utah law recognizes a cause of action for aiding and abetting a breach of a fiduciary duty (<u>see</u>, <u>e.g.</u>, <u>Mower v. Simpson</u>, 278 P.3d 1076, 1088 (Utah App. 2012)), this assertion goes nowhere, because the Church does not owe its members or donors a fiduciary duty in the first place.  Therefore, there was no breach for Ensign Peak to aid.  <u>See</u>, <u>e.g.</u>, <u>Gaddy v. Church</u>, 665 F. Supp. 3d 1263, 1291-92 (D. Utah 2023) ("<u>Gaddy III</u>") (there is no "legally cognizable fiduciary duty" arising "from ecclesiastical relationships"); <u>Jackson v. Educ. & Emp't Ministry</u>, 686 Fed. Appx. 577, 581 (10th Cir. 2017) (no "fiduciary relationship" between donor and donee); <u>see also</u> Church Motion to Dismiss (MDL Dkt. 79) at § III.A.1.

Plaintiffs point to the Utah Charitable Solicitations Act ("UCSA").  <u>See</u> Utah Code § 13-22-1 <u>et</u> <u>seq.</u>  But it has nothing to do with this case.  Before recent amendments, it imposed registration and disclosure requirements on certain charitable entities and professional fundraising consultants, but it <u>expressly</u> exempted religious organizations.  <u>Id.</u> § 13-22-8(1).  After recent revisions, it requires "professional fund raiser[s]" to register with the Division of Consumer Protection before fundraising in Utah.  <u>Id.</u> § 13-22-5(1).  A "professional fund raiser" is defined

as a person who gets paid to solicit contributions to a charitable organization.  Id. § 13-22-2(16).

But Plaintiffs do not allege that Ensign Peak is paid to solicit for the Church.  So they point to this

provision:

> Every person soliciting, collecting, or expending contributions for charitable
> purposes, and every officer, director, trustee, or employee of any person concerned
> with the solicitation, collection, or expenditure of those contributions, shall be
> considered to be a fiduciary and acting in a fiduciary capacity.

Id. § 13-22-23.  This too fails, because this provision identifies people who owe a fiduciary duty

to the charity on whose behalf they work.  Nothing in the UCSA imposes on the charity or its

investment manager a fiduciary duty to donors.  Ensign Peak's duty is to the Church, not the

Church's donors.  In any case, as this Court has held, "the UCSA does not create a private cause

of action."  Gaddy III, 665 F. Supp. 3d at 1294; see also Church Motion to Dismiss (MDL Dkt.

79) at § III.A.1.  Therefore, Plaintiffs fail to plead a claim for breach of fiduciary duty.

Also, Plaintiffs lack standing to sue Ensign Peak for breach of fiduciary duty.  Indeed, any

claim requiring donations to be used in accordance with Plaintiffs' view of their donative intent

(e.g., without saving or investing any portion of them) would violate the well-established rule that

"a donor who has made a completed charitable contribution…. ha[s] no standing to bring an action

to enforce the terms or his or her gift or trust."  Siebach v. Brigham Young Univ., 361 P.3d 130,

135 (Utah App. 2015).

For all these reasons, Plaintiffs' fiduciary duty claim should be dismissed with prejudice.

## II.    PLAINTIFFS FAIL TO PLEAD A CLAIM FOR FRAUDULENT INDUCEMENT AGAINST ENSIGN PEAK

Plaintiffs' cause of action for fraudulent inducement similarly fails.  See Consol. Compl.

¶¶ 157-67.  To plead fraud, Plaintiffs must plead factual allegations that, if true, would establish:

> (1) that a representation was made (2) concerning a presently existing material fact
> (3) which was false and (4) which the representor either (a) knew to be false or
> (b) made recklessly, knowing that there was insufficient knowledge upon which to
> base such a representation, (5) for the purpose of inducing the other party to act
> upon it and (6) that the other party, acting reasonably and in ignorance of its falsity,

(7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

Armed Forces Ins. Exch. v. Harrison, 70 P.3d 35, 40 (Utah 2003).  Plaintiffs must also state "with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This requires setting forth the "time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof."  Lawrence Nat'l Bank, 924 F.2d at 180. Plaintiffs' claim fails at least three of these elements as a matter of law.

### A.  Plaintiffs Identify No Representation Made To Them By Ensign Peak

First, the Consolidated Complaint does not identify any statement Ensign Peak allegedly made to Plaintiffs.  The closest it comes is quoting Ensign Peak's articles of incorporation, which state that it "is organized and shall be operated exclusively for religious, educational and charitable purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code, to benefit, perform the functions of, or carry out the purposes of" the Church and that all property held by Ensign Peak "is irrevocably dedicated to religious, educational and charitable purposes…." Consol. Compl. ¶ 81.  This is, of course, not a representation made to Plaintiffs, who by their own allegations were not even aware Ensign Peak existed until 2019.

If a donor had standing to sue a Section 501(c)(3) organization for conduct the donor believed was contrary to that organization's articles of incorporation, then any donor could bring precisely the kind of suit that Siebach and the vast weight of authority prohibit.  See Siebach, 361 P.3d at 135.  Restrictions in a charity's articles of incorporation are enforceable (if at all) only by the attorney general, not by individual donors or a class of donors.  "[T]he donor relinquishes his or her personal interest in an unrestricted charitable gift once the gift is complete, and thereafter it becomes the duty of the attorney general to vindicate the public interest in ensuring that charitable organizations use donated funds appropriately."  Id. at 140.

### B.   The Statements In Ensign Peak's Articles Of Incorporation Are True

Second, even if Plaintiffs could base a fraud claim on Ensign Peak's articles of incorporation, their own allegations establish that the statements in the articles of incorporation are true.  Plaintiffs assert that Ensign Peak "has never fulfilled its purported mission for [the Church] nor functioned as a charitable entity" but, instead, has "done only one thing: it has invested donations collected by [the Church] without ever disbursing these funds toward any charitable purpose."  Consol. Compl. ¶ 82.  But even if that were true (and it is not) it is not fraud.  Holding and investing the Church's reserve fund is a charitable function the law explicitly approves.

Like most large charitable institutions, the Church has affiliated legal entities to carry out different functions on its behalf.  The law recognizes that a close affiliate "controlled by and serv[ing] almost exclusively" a central organization and related parties qualifies as a tax-exempt "integral part" of the central organization, even if its activities, in isolation, might appear commercial or noncharitable.  Rev. Rul. 58-194, 1958-1 C.B. 240; see also Squire v. Students Book, 191 F.2d 1018 (9th Cir. 1951) (upholding exemption for a college-controlled cafeteria and bookstore due to its "close and intimate relationship to the functioning of the [c]ollege itself").  IRS regulations give the example of an entity whose sole function is operating an electric power plant to provide electricity to its controlling nonprofit university.  Even if the power plant engages in no traditional charitable activity and charges the university enough for electricity to earn a profit, the entity is still tax-exempt, because it is doing something its nonprofit parent could do for itself and, therefore, operating exclusively in furtherance of its parent's charitable purposes.  Treas. Reg. § 1.502-1(b); see also IHC Health Plans v. Comm'r, 325 F.3d 1188, 1202-03 (10th Cir. 2003) (discussing and approving this example).

This principle does not apply if the activity in question is one that would be an "unrelated trade or business" if the parent carried it out directly.  But the investment activities of a tax-exempt organization are not "the conduct of a trade or business."  Rev. Rul. 78-88, 1978-1 C.B. 163 .

Thus, there is no bar to a tax-exempt organization locating its routine investment functions in an "integral part" of an organization like Ensign Peak.[3]  For example, Revenue Ruling 78-41 states that a trust formed to hold and invest reserve funds to pay malpractice claims brought against a nonprofit hospital "is operated exclusively for charitable purposes and is exempt from tax under section 501(c)(3) of the Code." Rev. Rul. 78-41, 1978-1 C.B. 148.  The ruling explains that "Section 501(c)(3) of the Code provides for the exemption from Federal income tax of organizations organized and operated exclusively for charitable purposes," and that by serving as a "repository for [the hospital's] funds" and because it is "performing a function that the hospital could do directly," the trust was an "integral part" of the hospital entitled to be treated like the hospital. Id. at 1-2.  The same holds true for Ensign Peak.  It is a "repository" for the Church's reserve funds and "perform[s] a function that the [Church] could do directly" and is, therefore, entitled to be treated like the Church.

The IRS has rejected tax-exempt status for organizations that act like commercial investment firms by providing investment management services to unrelated nonprofits for a fee. Rev. Rul. 69-528, 1969-2 CB 127; Rev. Rul. 72-369, 1972-2 C.B. 245.  But this was because Treasury Regulation 1.502(b)-1's exception for "integral part" organizations does not apply if "the organization is owned by several unrelated exempt organizations" or sells to "consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations)." Rev. Rul. 69-528, 1969-2 CB 127 (quoting Treas. Reg. § 1.502-1(b)).

Unlike the investment management entities disapproved by the IRS, Ensign Peak operates solely to invest the reserve funds for the Church.  Plaintiffs have not alleged that Ensign Peak

---

[3]  Harvard Management Company is a Section 501(c)(3) organization that "manages Harvard University's endowment and related financial assets… to help ensure Harvard University has the financial resources to confidently maintain and expand its leadership in education and research for future generations." About HMC.  Harvard's endowment exceeds $50 billion. Harvard Univ. Financial Report (FY 2023).

9

provides investment management services for any other organization (nor could they). Thus, rather than establishing any wrongdoing or abuse of its tax-exempt status, Plaintiffs' allegations show that Ensign Peak is an "integral part" of the Church and, therefore, is treated under the law as operating "exclusively for charitable purposes," even if all it does is invest on the Church's behalf. Rev. Rul. 78-41, 1978-1 C.B. 148.[4]

### C.    Plaintiffs Make No Allegations Of Reliance On Any Representation By Ensign Peak

Third, Plaintiffs do not (and cannot) plead that they reasonably relied on a false statement made by Ensign Peak. "In a fraud action, a plaintiff must demonstrate that he or she, acting reasonably and in ignorance of the statement's falsity, did in fact rely upon the misrepresentation," and "the reliance must be justifiable under the circumstances." Conder v. A.L. Williams, 739 P.2d 634, 638 (Utah App. 1987). Plaintiffs make no allegation of reliance on any representation made by Ensign Peak. They do not claim to have read or even been aware of Ensign Peak's articles of incorporation, for example.

Reliance allegations are especially important in this case where the conduct at issue— giving tithes—is not a one-time transaction but is, instead, part of a pattern of years of conduct deeply rooted in religious belief, such that reliance on particular statements is not readily evident, if at all. A plaintiff must plead facts to establish "some objective corroboration to [his] claim that he did rely;" otherwise a person's mere declaration of reliance would be "sufficient evidence on the basis of which a finder of fact can find reliance" and it "will be too easy" for a person to merely assert reliance. Conder, 739 P.2d at 638. Here, even with respect to the Church's statements, much less to the non-statements of Ensign Peak, Plaintiffs make at best exactly the kind of bare

---

[4] This is not all Ensign Peak does. It also performs day-to-day cash management functions for the Church, among other things.

assertion of "reasonable reliance" Utah courts have routinely rejected.  See, e.g., Consol. Compl. ¶ 165.

Ultimately, Plaintiffs plead none of the elements of fraud against Ensign Peak, and it is clear they never can.  Their fraudulent inducement claim should thus be dismissed with prejudice.

## III.  PLAINTIFFS FAIL TO PLEAD A CLAIM FOR FRAUDULENT CONCEALMENT AGAINST ENSIGN PEAK

Plaintiffs' fraudulent concealment claim—their third cause of action—is premised on the assertion that the Church and Ensign Peak had a "duty to communicate" to the Church's donors that the Church has a reserve fund and that Ensign Peak manages and invests that reserve fund. Consol. Compl. ¶ 169.  Instead of sharing this information, the Church allegedly "concealed the full extent of its holdings."  Id. ¶ 171.  To prevail on this claim, "a plaintiff must prove '(1) that the nondisclosed information is material, (2) that the nondisclosed information is known to the party failing to disclose, and (3) that there is a legal duty to communicate.'"  Gaddy v. Church, 451 F. Supp. 3d 1227, 1235 n.73 (D. Utah 2020) ("Gaddy I") (quoting Yazd v. Woodside Homes, 143 P.3d 283, 286 (Utah 2006)).  With respect to Ensign Peak, the claim fails on both the first and third elements.

### A.  Ensign Peak Did Not Have A Duty Of Disclosure

Taking the third element first, whether a duty to disclose exists is "a purely legal question." Yazd, 143 P.3d at 286.  Resolving a similar claim, this Court held that "Plaintiffs cannot show that a legal duty exists between the Church and its members requiring disclosure of material financial information."  Gaddy III, 665 F. Supp. 3d at 1291.  No authority says a church has a "duty to publicly disclose the use of its funds."  Id.  Ensign Peak is a step further removed from Plaintiffs than the Church and has no relationship with Plaintiffs whatsoever.  Where "no relationship between the parties exists" at all, even "[a] person who possesses important, even vital, information of interest to another has no legal duty to communicate the information ...."  Yazd, 143 P.3d at

287.  For this reason alone, the Court should dismiss the fraudulent concealment claim against Ensign Peak.

**B.  Plaintiffs Fail To Plead Materiality, And The Church Autonomy Doctrine Otherwise Prohibits The Court From Determining What Is Material To A "Reasonable" Church Member In Deciding To Give Tithes**

Even if a duty to disclose existed (and it does not), this claim would still fail against Ensign Peak.  "Silence, in order to be actionable fraud, must relate to a material matter…."  Mitchell v. Christensen, 31 P.3d 572, 574 (Utah 2001).  A non-disclosed fact is material if it is something a person of "ordinary intelligence and prudence" would rely upon in determining their course of action.  Gilbert Dev. v. Wardley, 246 P.3d 131, 141 (Utah App. 2010).  Such "reasonableness is not based on the subjective state of mind of the person claiming he was misled, but rather is… based on an objective test, i.e., what would a reasonable person conclude under these circumstances."  Youngblood v. Auto-Owners Ins., 158 P.3d 1088, 1096 (Utah 2007).

Here, the question is whether the size of the Church's reserve fund is material to a "reasonable" Church member deciding whether to obey the scriptural and doctrinal law of tithing. Setting aside the fact that the vast majority of Church members who were giving tithes before the 2019 IRS Letter continue to give tithes, this Court rejected in Gaddy III a similar fraudulent concealment claim, because it recognized that it could not "adjudicate the duty or materiality elements" of fraudulent concealment in this context "without running afoul of the church autonomy doctrine."  Gaddy III, 665 F. Supp. 3d at 1289.

The Church Autonomy Doctrine is based partly on a "notion of judicial incompetence with respect to strictly ecclesiastical matters…."  Fratello v. Archdiocese of N.Y., 863 F.3d 190, 203 (2d Cir. 2017).  Materiality as it relates to tithing is a "matter[] about which" courts and juries "ha[ve] neither competence nor legitimacy" to judge.  Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1265 (10th Cir. 2008).  Tithing differs from any other "transaction" in which a person parts with money, as the terms of the exchange and donors' motivations transcend the secular world.  In

the context of tithing, materiality cannot be separated from questions of doctrine and faith. "[T]ithing is at its core a <u>purely</u> ecclesiastical matter." <u>Hawthorne v. Couch</u>, 911 So.2d 907, 910 (La. App. 2005).

A judge or jury would violate the First Amendment right off the bat in attempting to assess materiality, as they would necessarily have to determine who a "reasonable" Church member is and whether that "reasonable" Church member would deem it "important" in his or her quest to comply with a <u>religious</u> commandment to know that the Church had substantial reserve funds. That fraught inquiry would be followed by the reality that to determine the materiality of the undisclosed information, the jury would have to consider the transaction as a whole. "[W]hether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." <u>Ganino v. Citizens Utils.</u>, 228 F.3d 154, 162 (2d Cir. 2000). A jury would thus have to determine what the "relevant" circumstances are in the transaction at issue—years of giving tithes to the Church. And given the nature of tithing, assessing the transaction as a whole would require assessing the Church's doctrinal teachings. The Church has always taught that tithing is a commandment from God, one delivered in modern times through the Prophet Joseph Smith. <u>See</u> Doctrine and Covenants § 119. If Joseph Smith was a fraud, giving tithes to the Church is foolish. If he was a prophet, giving tithes is a commandment from God, and not obeying it would be ill-advised:

> This court can no more determine whether Joseph Smith saw God and Jesus Christ or translated [the Book of Mormon] with God's help … than it can opine on whether Jesus walked on water or Muhammed communed with the archangel Gabriel. The First Amendment prohibits these kinds of inquiries in courts of law.

<u>Gaddy I</u>, 451 F. Supp. 3d at 1235-36.

Additionally, assessing the materiality of undisclosed information in a transaction requires some evaluation of what the person was promised in return for their consideration. The Church teaches and its faithful members steadfastly believe that God grants unmeasurable blessings to

those who honestly tithe.  God will "open you the windows of heaven, and pour you out a blessing, that there shall not be room enough to receive it."  Malachi 3:10.  To the unbeliever, this is hokum. But neither a court nor a jury can assess "the truth or verity of… religious doctrines."  U.S. v. Ballard, 322 U.S. 78, 86 (2012).  That makes assessing materiality in this context impossible.

For all these reasons, Plaintiffs have not (and cannot) plead a claim for fraudulent concealment against Ensign Peak, and the claim should be dismissed with prejudice.

## IV.    PLAINTIFFS DO NOT STATE A CLAIM AGAINST ENSIGN PEAK FOR FRAUDULENT MISREPRESENTATION

Plaintiffs' fraudulent misrepresentation claim is based on assurances that "no tithing" would be used for City Creek.  Consol. Compl. ¶¶ 178-82.  This claim is addressed at length in the Church's motion to dismiss, and Ensign Peak adopts those arguments and incorporates them here fully by reference.  See Church Motion to Dismiss (MDL Dkt. 79) at § III.B.2.  Apart from those incorporated arguments, the fraudulent misrepresentation claim also fails as to Ensign Peak, because Plaintiffs do not plead that Ensign Peak made any statement related to the funding for City Creek.  Ensign Peak's only involvement was providing funding from earnings on invested reserves, which is "exactly what [President Gordon B.] Hinckley said [the Church] would do." Huntsman v. Church, 2021 WL 4296208, *5 (C.D. Cal. 2021).  This claim should also be dismissed with prejudice.

## V.    PLAINTIFFS DO NOT STATE A CLAIM AGAINST ENSIGN PEAK FOR UNJUST ENRICHMENT

Plaintiffs' unjust enrichment claim is also addressed in the Church's motion to dismiss, and Ensign Peak adopts those arguments (which are equally applicable to Ensign Peak) and incorporates them here fully by reference.  See Church Motion to Dismiss (MDL Dkt. 79) at § III.D.  In addition to those arguments, Plaintiffs' unjust enrichment claim against Ensign Peak independently fails, because Plaintiffs do not allege that they conferred any benefit upon Ensign Peak.  The claim also fails, because the alleged unjustness of the enrichment is based on the alleged

fraud, thus tying the veracity of the unjust enrichment claim to the fraud claim.  See Consol. Compl. ¶¶ 184-90.  That is, Plaintiffs contend that it would be "inequitable" to allow the Church to retain the donated funds, because "the statements made to solicit the donations were false and misleading."  Id. ¶¶ 190-91.  Plaintiffs' failure to plead fraud, therefore, also defeats their unjust enrichment claim.  As to Ensign Peak, therefore, this claim should also be dismissed with prejudice.

## VI.    PLAINTIFFS' ALLEGATIONS REGARDING ENSIGN PEAK'S SEC DISCLOSURES AND IRS FILINGS ARE UNRELATED TO PLAINTIFFS' CLAIMS

Plaintiffs spend much space in the Consolidated Complaint making allegations regarding Ensign Peak's IRS and SEC disclosures, apparently trying to buttress their allegations of fraud arising from supposed misrepresentations in these disclosures—despite the fact that Plaintiffs never knew about these disclosures until the 2019 IRS Letter (or later) and thus could not possibly have been deceived by them or relied upon them in paying tithing.  See Consol. Compl. ¶¶ 13, 87-90, 92, 102.  These allegations are nothing more than red herrings attempting to divert attention away from Plaintiffs' inability to plead any viable claim against the Church or Ensign Peak, while improperly disparaging the Church and Ensign Peak.

Regarding Ensign Peak's IRS tax forms, IRS regulations require tax-exempt organizations that receive income of $1,000 or more from an "unrelated" trade or business to annually file Form 990-T.  See IRS Form 990-T Instructions.  This form asks the filer to disclose the "book value of all assets at end of year" even though this information has nothing to do with the purpose of Form 990-T or the calculation of income taxes owed and reported on such form.  See IRS Form 990-T at § C .  Importantly, however, the Internal Revenue Code exempts churches and their integrated auxiliaries from any requirement to disclose this information on Form 990-T.  See 26 U.S.C. § 6033(a)(3)(A)(i) ("Paragraph (1) [requiring every tax-exempt organization to file an annual return] shall not apply to—(i) churches [and] their integrated auxiliaries…").  Thus, in 2017, 2020

15

and 2021, Ensign Peak left the box empty, as it was allowed to do by law.  In most years, however, Ensign Peak listed "over $1,000,000," which was a truthful statement.  The IRS never raised any concerns about Ensign Peak's 990-T responses.

Plaintiffs nevertheless complain that in 2007, some 17 years before they filed suit, Ensign Peak omitted the "over" and simply listed $1,000,000 on Form 990-T.  Consol. Compl. ¶ 87.  Plaintiffs therefore claim Ensign Peak made "misleading statements in sworn financial reports to the IRS."  Id.  But even if this mistake were a "misleading statement," Plaintiffs fail to connect Ensign Peak's 2007 Form 990-T filing (or any of Ensign Peak's tax filings) to any of their claims.  Plaintiffs do not plead that they relied on or were even aware of these filings or that they have anything to do with the alleged fraud.  Nowhere does the Consolidated Complaint allege, for example, that Plaintiffs saw Ensign Peak's 2007 Form 990-T, believed that the Church was investing no more than $1,000,000 and on that basis, decided to give tithes to the Church.[5]

And regarding Ensign Peak's SEC filings, Section 13F of the Securities Exchange Act of 1934 requires institutional investment managers to file quarterly reports that disclose management of certain securities.  See 17 C.F.R. § 240.13f-1(a)(1) ("Every institutional investment manager which exercises investment discretion with respects to accounts holding section 13(f) securities… having an aggregate value… of at least $100,000,000 shall file a report on Form 13F[.]").  Plaintiffs allege that beginning in 2001, the Church and Ensign Peak tried to maintain the confidentiality of Ensign Peak's holdings by dividing these securities among different companies and having each separately file Form 13F.  The SEC first expressed concern with this practice in June 2019, and

---

[5] This example clearly illustrates that all references to the IRS tax form in the Consolidated Complaint are immaterial to any of the allegations and are included merely to try to disparage the Church.  They should be stricken.  See Fed. R. Civ. P. 12(f) ("[T]he court may strike from a pleading… any redundant, immaterial, impertinent, or scandalous matter.").

Ensign Peak promptly began filing a single aggregated report as to its management of such securities.[6]

But as with Form 990-T, Plaintiffs make no effort to connect Ensign Peak's Form 13F filings to their claims. Plaintiffs do not make any allegation that the Church's Form 13F filings deceived them. They do not allege, for example, that they saw and relied on Ensign Peak's SEC filings in deciding whether to tithe. Nor do they allege that the information in the SEC filings was information the Church or Ensign Peak had a duty to disclose to them. As with the IRS form, Plaintiffs' reference to Ensign Peak's SEC filings is purely an attempt to disparage the Church, not to support any claim. See Fed. R. Civ. P. 12(f).

## VII.    PLAINTIFFS' CLAIMS ARE ALSO BARRED BY THE STATUTE OF LIMITATIONS

The three-year statute of limitations in Utah Code § 78B-2-305 applies to all claims grounded in fraud. Rabo Agrifinance v. Bliss, 227 F. Supp. 3d 1249, 1252 (D. Utah 2017) (citing Hill v. Allred, 28 P.3d 1271, 1276 (Utah 2001)).[7] This includes all claims that "regardless of their specific labels, are based on the same core allegations of deception, false representations, and fraudulent conduct." Security Sys. v. Alder Holdings, 421 F. Supp. 3d 1186, 1194 (D. Utah 2019).

The three years "begin[s] running from the date a plaintiff either discovered or should have discovered his or her claim."[8] Russell Packard, 108 P.3d at 746. This occurs when a plaintiff has "actual knowledge of the fraud or by reasonable diligence and inquiry should know the relevant

---

[6] These forms are public record and show that on February 14, 2020, Ensign Peak reported just short of $38 billion in its portfolio.

[7] Ensign Peak adopts and incorporates herein the choice of law analysis provided in the Church's motion to dismiss. See Church Motion to Dismiss (MDL Dkt. 79) at § IV.A. That analysis makes clear that Utah law should apply. See id.

[8] Plaintiffs cannot rely on any theory of tolling other than the discovery rule built into the fraud statute of limitations. Other tolling options "apply only where a statute of limitations does not, by its own terms, already account for such circumstances—i.e., where a statute of limitations lacks a statutory discovery rule." Russell Packard Dev. v. Carson, 108 P.3d 741, 747 (Utah 2005).

facts of the fraud." <u>Colosimo v. Roman Catholic Bishop</u>, 156 P.3d 806, 811 (Utah 2007) (cleaned up).  The "opportunity of knowing" the relevant facts suffices.  <u>Baldwin v. Burton</u>, 850 P.2d 1188, 1196 (Utah 1993).  "That opportunity occurs upon discovery of some fact that 'should have incited suspicion of fraud' because such discovery 'would have then sparked further inquiry.'"  <u>Donner v. Nicklaus</u>, 197 F. Supp. 3d 1314, 1325 (D. Utah 2016) (quoting <u>Baldwin</u>, 850 P.2d at 1197); <u>see also</u> <u>Shiozawa v. Duke</u>, 344 P.3d 1174, 1179 (Utah App. 2015) ("[A] party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge.").

Here, as is clear from their own allegations, Plaintiffs' claims accrued in December 2019 when the IRS Letter was published and began to receive significant attention.  All the allegations Plaintiffs make either come from the IRS Letter or were already available to Plaintiffs when the IRS Letter was publicized.  This is clear from a quick review of the Consolidated Complaint:

1. Paragraphs 1-3 are based on the IRS Letter.

2. Paragraphs 4-7 are general allegations about tithing and fast offerings that have always been available to Plaintiffs.

3. Paragraphs 8-11 are based on the IRS Letter.

4. Paragraphs 12-13 are based on Ensign Peak's Form 13F filings, which were discussed in the IRS Letter.  <u>See</u> Letter to an IRS Director at 23-24.

5. Paragraph 14 is based on the IRS Letter.

6. Paragraph 15 is a general statement about Plaintiffs' claims.

7. Paragraphs 16-45 contain general allegations about the parties and contain no information that was not available to Plaintiffs when the IRS Letter was published.

8. Paragraphs 46-52 contain allegations about why the statute of limitations should be tolled and contain no information unavailable to Plaintiffs when the IRS Letter was published.

9. Paragraphs 53-78 contain information that was always available to Plaintiffs about the types of donations the Church accepts.

10. Paragraph 79-91 are all based expressly on the IRS Letter, as seen in the footnote citations.

11. Paragraphs 92-99 are about Ensign Peak's Form 13F filings, which were discussed in the IRS Letter and, in any case, form no part of Plaintiffs' claims.

12. Paragraphs 100-101 relate to statements made by the Church in each semi-annual General Conference since at least 1998.

13. Paragraph 102 quotes statements made by Ensign Peak's CEO quoted in newspaper articles published on February 8, 2020. But even if those articles (instead of the IRS Letter) triggered the statute of limitations, Plaintiffs' claims would still be untimely.

14. Paragraph 103 contains no additional factual allegations.

15. Paragraphs 104-115 are all based either on the IRS Letter or public statements made about City Creek funding between 2003 and 2012 (see Consol. Compl. at ¶¶ 104-15, nn.52-54).

16. Paragraphs 116-133 contain Plaintiffs' allegations about how much they donated to the Church and why, which is information they always had.

17. Paragraphs 134-145 contain class allegations, and Paragraphs 146-193 contain the causes of action. These paragraphs do not contain any additional factual claims.

In short, Plaintiffs do not identify <u>any</u> information relevant to their claims that was not available to them at least three years before filing suit. "[A] complaint showing that the statute of limitations has run on the claims is the most common situation in which [an] affirmative defense appears on the face of the pleading," making such claims properly subject to a Rule 12(b)(6) motion. <u>Tucker v. State Farm</u>, 53 P.3d 947, 950 (Utah 2002). Their fraud claims are thus barred by the statute of limitations. <u>See</u>, <u>e.g.</u>, <u>HKS Architects v. MSM Enters.</u>, 496 P.3d 228, 235-36 (Utah App. 2021) (Defendants "were able to rely on the statute of limitations in their rule 12(b)(6) motion with respect to HKS's fraud… claims because… the complaint described events that established when the statute of limitations began to run, thus rendering it subject to dismissal for failure to state a claim.").

Not only are Plaintiffs' fraudulent inducement, fraudulent concealment and fraudulent misrepresentation claims barred, but their unjust enrichment claim is as well, because it is rooted in the same fraud allegations. Plaintiffs allege the Church and Ensign Peak were unjustly enriched, because they "made material misrepresentations and omissions to Plaintiffs" (Consol. Compl. ¶ 184), "misrepresented the full extent of its holdings" (<u>id.</u> ¶ 185), "Ensign Peak contributed to the fraud" (<u>id.</u> ¶ 186), Plaintiffs "donated money to Defendants in reliance on those misrepresentations

19

and omissions" (id. ¶ 187), and the Church and Ensign Peak "accepted and retained the donated funds, despite their knowledge that the statements made to solicit the donations were false and misleading" (id. ¶ 190). The unjust enrichment claim is plainly based on the "same core allegations of deception, false representations, and fraudulent conduct" as the fraud claims and is, therefore, subject to the fraud statute of limitations. See Security Sys., 421 F. Supp. 3d at 1194.

That leaves only Plaintiffs' claim for breach of fiduciary duty. Plaintiffs' fiduciary duty claim appears to be based on the UCSA. See Consol. Compl. ¶¶ 147-51. If that is the case, that claim is subject to the three-year statute of limitations for liability created by statute and is therefore barred. See Utah Code § 78B-2-305(4). In addition, Plaintiffs' fiduciary duty claim, like their unjust enrichment claim, is also rooted in the same fraud allegations:

> [The Church] and Ensign breached their fiduciary duty to Plaintiffs… by… misusing the donations, failing to use the donations as represented, failing to fully disclose to the Class all material facts and information in connection with their disposition of donated monies, and by continuing to misrepresent their use of donated funds and criminal activity after their scheme was partially disclosed to the public.

Consol. Compl. ¶ 153.

In the end, with respect to the statute of limitations, Plaintiffs' claims should be treated the same as the claims in Rabo Agrifinance. See Rabo Agrifinance, 227 F. Supp. 3d 1249. In that case, the court held that the three-year fraud limitations period applied to plaintiff's claims for fraud, fraudulent nondisclosure, aiding and abetting fraud and conspiracy, because all these claims "allege the same underlying theory that Rabo was fraudulently induced to enter into the loan." Id. at 1252. The court in Rabo Agrifinance held that all of Rabo's fraud-based claims were barred, because it had actual knowledge it was defrauded when it received a Borrower's Financial Statement on April 17, 2012, which revealed Borrowers had underreported their accounts payable by over $2.5 million. Id. at 1251-53. Although Rabo did not know the full extent of the fraud— something it learned after further investigation—it knew enough based on the Borrower's Financial Statement to bring a claim. Id. at 1253-54.

That is exactly the case here. Plaintiffs knew or clearly could have known all the facts on which their claims are based when the IRS Letter was publicized in December 2019. Their claims are therefore barred and should be dismissed with prejudice.

**CONCLUSION**

For the reasons set forth above, each of Plaintiffs' claims against Ensign Peak should be dismissed with prejudice. No amount of repleading can change the fatal deficiencies in Plaintiffs' claims vis-à-vis Ensign Peak, such as: the lack of <u>any</u> statement by Ensign Peak or <u>any</u> relationship between Ensign Peak and Plaintiffs (let alone the existence of a fiduciary duty) and the inability of a finder of fact to pass on the materiality of any undisclosed statement under the Church Autonomy Doctrine or, at the very least, the inability of Plaintiffs to escape the statute of limitations precluding their claims.

While leave to amend should be freely given "when justice so requires," it is not required here. "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile." <u>Brereton v. Bountiful City</u>, 434 F.3d 1213, 1219 (10th Cir. 2006). That is the case, for example, when a claim is barred by the statute of limitations. <u>See</u>, <u>e.g.</u>, <u>Gee v. Pacheco</u>, 627 F.3d 1178, 1185 (10th Cir. 2010) (holding that leave to amend need not be granted for "claims that are barred by… the statute of limitations so that amending those claims would be futile"). This is also true of claims barred by the Church Autonomy Doctrine, which is akin "to a government officials defense of qualified immunity." <u>Gaddy III</u>, 665 F. Supp. 3d at 1281 (citing <u>Bryce v. Episcopal Church</u>, 289 F.3d 648, 654 (10th Cir. 2002)). Accordingly, all claims in the Consolidated Complaint against Ensign Peak should

be dismissed <u>with</u> <u>prejudice</u>, and the Court should grant whatever other relief is just and appropriate.

Date:  September 10, 2024

Respectfully submitted,

*/s/ Mark S. Mester*
Mark S. Mester, *Counsel for Defendant Ensign Peak Advisors, Inc.*

Jason R. Burt (Utah Bar No. 11200)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Email:  jason.burt@lw.com

Mark S. Mester (admitted *pro hac vice*)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Email:  mark.mester@lw.com

David J. Jordan (Utah Bar No. 1751)
Wesley F. Harward (Utah Bar No. 15623)
FOLEY & LARDNER LLP
95 South State Street, Suite 2500
Salt Lake City, Utah  84111
Telephone: (801) 401-8900
Email: djordan@foley.com
        wharward@foley.com

Randy T. Austin (Utah Bar No. 6171)
Wade L. Woodard (Utah Bar No. 18155)
Justin W. Starr (Utah Bar No. 10708)
KIRTON MCCONKIE PC
36 South State Street, Suite 1900
Salt Lake City, Utah  84111
Telephone: (801) 328-3600
Email: raustin@kmclaw.com
        wwoodard@kmclaw.com
        jstarr@kmclaw.com